**CLOSED**
**CIVIL**
**CASE**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION



CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

ADRIENE POSELY and KARL O.
BLOOMFIELD, individually and on behalf of
all other employees of Defendant similarly
situated,

       Plaintiff(s),

vs.

ECKERD CORPORATION, a Florida
corporation doing business in Florida,

       Defendant.

_____/

## ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT

**THIS CAUSE** came before the Court on Defendant, Eckerd Corporation's ("Eckerd['s]")

Renewed Motion for Final Summary Judgment **[D.E. 294]**, filed on December 9, 2005. The Court

held a hearing on the matter on February 7, 2006 and has carefully considered the parties' written

submissions and all applicable law.

This case, filed over three years ago, has enjoyed, or suffered from, a long and tortured

history, replete with multiple discovery disputes that continue to this day. Eckerd initially filed a

Motion for Summary Judgment on April 28, 2004 [D.E. 54]. In an order dated January 13, 2005

[D.E. 175], the Court stayed that summary judgment motion, affording Plaintiffs "an opportunity to

review outstanding discovery and perhaps supplement the information provided in their summary

judgment papers." Now, more than two years after the initial motion for summary judgment was

filed, and more than one year following the order staying that prior motion, the Court again *considers*

Eckerd's Motion for Summary Judgment.

CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

## I. BACKGROUND

Eckerd is a retail pharmacy chain, and during the relevant time period, operated drug stores in 23 states. (*Sidman Dep.* p. 17)(Def. App. [D.E. 296] Ex. 3).[1]  Plaintiffs were employed by Eckerd as store managers[2] for varying lengths of time prior to commencement of this suit.  Plaintiffs, for themselves and as representatives of a purported class,[3] claim to have been under-compensated by Eckerd and assert various state and federal causes of action against Eckerd.

Although the parties dispute the overall level of autonomy that Eckerd afforded its store managers, most of the specific functions of the store managers, and the constraints placed upon the exercise of those functions, are not in dispute.  In contrast, the *legal ramifications* of Plaintiffs' employment duties and the limitations thereon are hotly contested.

### *General Job Description*

Store managers are at the top of each store's hierarchy.  (*McGinnis Dep.* p. 12)(Def. App. Ex. 4).  Within a store, managers are the party most responsible for maximizing revenues in their store.  (*See McGinnis Dep.* pp. 106-07).  A store manager is typically responsible for handling between $3-4 million in revenue per year, although revenues vary greatly from store to store. (*Sidman Dep.* p. 20).  Store managers are entitled to receive bonuses as part of their compensation

---

[1]  Although not relevant to disposition of the case, Eckerd sold its Florida assets to CVS Pharmacy on July 31, 2004.

[2]  Plaintiffs held various positions throughout their employment with Eckerd.  This litigation focuses almost exclusively upon Plaintiffs' time spent as managers.

[3]  While Plaintiffs were permitted to furnish statewide notification pursuant to 29 U.S.C. § 216(b), the Motion for Class Certification was stayed, along with the earlier motion for summary judgment. [D.E. 175].

package. (*Bloomfield Dep.* p. 21; *Waite Dep.* p. 33)(Def. App. Exs. 7, 11).[4]  Moreover, managers at higher revenue stores receive greater salaries. (*Colon Dep.* p. 23)(Def. App. Ex. 9).

Managers have a huge impact on a store's profitability. (*See Colon Dep.* pp. 24, 63 (stating that manager is most important factor in increasing a store's sales volume); *Hodges Dep.* p. 79 (Def. App. Ex. 17)(store manager "influence[s] and impacts the sales more [than] anybody else"); *Id.* at pp. 89-90 (store manager is captain of the ship)).  Opt-in Plaintiff Brazeau agreed that "with respect to whether the store does good or bad, it falls on" the manager's head. (*Brazeau Dep.* p. 42).  Likewise, opt-in Plaintiff Waite agreed that the store manager was "ultimately responsible for the store." (*Waite Dep.* p. 24).

Store managers are expected to work at least 40 hours per week. (*McGinnis Dep.* p. 51).  Eckerd does not regulate the maximum hours worked by store managers.  (*Id.*).   The record, however, indicates that managers typically work far more than 40 hours per week. (*See Posely Dep.* p. 32 (Def. App. Ex. 5); *Bloomfield Dep.* p. 57; *Waite Dep.* p. 45; *Razack Dep.* p. 16 (Def. App. Ex. 15)).  Moreover, managers are apparently required to receive permission from the district manager if they intend to work less than 40 hours in any week. (*Colon Dep.* p. 57).

### District Managers and Front End Supervisors

Store managers are supervised by front-end supervisors as well as district managers[5] who

---

[4]   The record is unclear on whether, and the extent to which, a manager's bonus is tied to his or her store's financial performance.

[5]   In Florida, for example, there were 10-15 districts; each district was headed by a district manager. (*Sidman Dep.* p. 49).

manage, according to Eckerd, between 25-30 stores. (*Statement of Undisputed Facts* p. 2).[6] District manager Felix Hodges testified that he currently manages 34 stores and had formerly managed 28 stores. (*Hodges Dep.* pp. 16, 20). Mr. Hodges further testified that district managers "are responsible for the every day operations, profits and losses of each of those locations, managing the staff, store staff, insuring compliance of the company programs." (*Hodges Dep.* p. 29).

The precise number of visits that district managers and front-end supervisors pay to a store varies. Plaintiff, Adriene Posely, testified that his store received visits between twice a week and twice a month (*Posely Dep.* p. 63), and Hodges testified that he visited stores approximately once per month , with each visit lasting approximately one to two hours. (*Hodges Dep.* p. 34). However, the record indicates that district managers communicate with each store manager as frequently as once per day. (*See id.*).

During store visits, district managers seek to ensure that the store is being operated pursuant to Eckerd's guidelines, and may offer advice to managers, and to other store employees, to help improve a store's operations or condition. (*See Posely Dep.* pp. 63-64). District managers often provide managers with explicit instructions regarding how to run the store. (*See Goodrich Dep.* pp. 15-16)(Def. App. Ex. 13). Moreover, the front-end supervisor and/or the district manager may, if necessary, provide direct training to assistant managers and other store employees. (*Neville Dep.* p. 32 (Def. App. Ex. 16); *Hodges Dep.* p. 38).

### *Managers' Authority Over Store Personnel*

Store managers maintain significant supervisory authority over the personnel of their stores.

---

[6] The front-end supervisors oversee all aspects of each Eckerd store with the exception of the pharmacy. They therefore have supervisory authority over store managers.

They are responsible for hiring, staffing, and scheduling decisions. (*McGinnis Dep.* p. 67; *Posely Dep.* p. 19; *Bloomfield Dep.* p. 42). They may delegate tasks to any of their subordinates and are ultimately responsible for the performance of their subordinates.[7] (*Brazeau Dep.* p. 39). In fact, Plaintiff Posely testified that he was the sole person in the store with the ultimate ability to delegate responsibility. (*Posely Dep.* p. 57; *see also Razack Dep.* p. 57).

Store managers establish the working schedule for each store employee, with the exception of the pharmacist. (*Posely Dep.* p. 30; *Bloomfield Dep.* p. 46; *Waite Dep.* p. 19; *Razack Dep.* pp. 54-55). As part of the schedule-making function, store managers approve time off and vacations for all hourly associates. (*Bloomfield Dep.* pp. 46-47; *Waite Dep.* p. 23). An employee may not deviate from the work schedule developed by the store manager without the express approval of the store manager. (*See Bloomfield Dep.* p. 46; *Waite Dep.* p. 23; *Posely Dep.* p. 31; *Razack Dep.* p. 55). Store managers also have the ultimate authority to approve corrections to hourly employees' time records. (*Bloomfield Dep.* p. 68).

A store manager's hiring and staffing discretion is circumscribed by Eckerd's corporate guidelines. For instance, although store managers may hire as many people as they deem necessary, they may not exceed the payroll budget established by Eckerd. (*McGinnis Dep.* p. 105). The payroll budget of a store is determined pursuant to a corporate formula. (*Goodrich Dep.* p. 18; *Hodges Dep.* p. 53). While the record does not indicate the precise variables utilized to determine each store's payroll budget, it does indicate that a store's sales volume is a paramount factor in determining the budget. (*See, e.g.*, *McGinnis Dep.* p. 101; *Goodrich Dep.* p. 20; *Hodges Dep.* pp. 69, 75).

---

[7] Other employees also have the power to delegate responsibility to their subordinates. (*Posely Aff.* ¶ 3bb).

Store managers must first administer a form/test to each job applicant.  (*Posely Aff.* ¶ 3c; *Bloomfield Aff.* ¶ 2c; *Colon Dep.* p. 26).  The applications are subsequently submitted to Eckerd headquarters for approval; no new employee may be hired absent prior Eckerd approval.  (*Id.*).  However, after receiving permission from Eckerd, the ultimate decision of whether to hire a new employee rests with the store manager.  (*Colon Dep.* pp. 25-26; *Brazeau Dep.* pp. 25-27; *Waite Dep.* p. 18).  Store managers hire pharmacy associates through a similar process, although pharmacy associates must also undergo a background check.  (*Colon Dep.* p. 31).  Store managers do not hire assistant managers, photo lab managers or pharmacists.  (*Posely Aff.* ¶ 3e; *Bloomfield Aff.* ¶ 2e).

Store managers conduct annual performance reviews of hourly associates, assistant managers, first and second assistant managers, and photo lab associates (in conjunction with the photo lab managers).  (*See Posely Dep.* p. 26; *Bloomfield Dep.* p. 45; *Brazeau Dep.* p. 52).  The annual evaluations determine whether an employee receives a raise, and the extent of the raise, within Eckerd guidelines.[8]  (*Posely Dep.* pp. 26-27; *Bloomfield Dep.* pp. 45-46).  Although Eckerd provides store managers with personnel evaluation checklists, the evaluations are conducted without contacting human resources.  (*Posely Dep.* p. 26).

Store managers retain the sole responsibility to notify Eckerd's human resources department of personnel problems.  Although assistant managers generally have the power to write up employees when the manager is not present, the appraisals may not be submitted to "corporate" absent the prior approval of a store manager.  (*See Posely Dep.* p. 21; *Brazeau Dep.* p. 24; *Waite Dep.* 28).  Store managers are also the only store employees with the power to recommend termination of other store

---

[8] Starting salaries are similarly determined by store managers within the guidelines set by Eckerd.

employees (including pharmacists). (*Brazeau Dep.* p. 28). The extent of this power, however, is in some dispute.

For instance, Posely testified that once he contacted human resources about a personnel problem, the department subsequently took control of the process. (*Posely Dep.* p. 20). Conversely, Bloomfield testified that he did have the power to recommend an employee's termination. (*Bloomfield Dep.* pp. 42-44; *see also Waite Dep.* pp. 26-27). It is undisputed, however, that before terminating a store employee, the store manager must initially confer with human resources and must abide by Eckerd's corporate policies. (*Colon Dep.* p. 79; *Waite Dep.* pp. 26-27).

***Inventory and Store Presentation***

A store manager ensures that his or her store has sufficient inventory, and is responsible for the presentation of the store. To this end, the manager must determine the amount of product to be ordered[9] and is in charge of merchandising/store presentation activities. (*Posely Dep.* pp. 28, 47). Although store managers may not directly enter into contracts with vendors (*Posely Aff.* ¶ 3j; *Bloomfield Aff.* ¶ 2j), they are responsible for resolving any discrepancies or conflicts with vendors concerning prior orders. (*See Bloomfield Dep.* p. 84). Ada Colon, a store manager, described her interactions with vendors as follows: "[f]irst I talk to that particular vendor, and if that doesn't get the result I need, I talk to him again, and then if that doesn't work, then I call his boss, and if that doesn't work, I call my boss." (*Colon Dep.* p. 13).

The store manager's ability to determine the amount, and type, of product to order is not

---

[9] The record indicates that at some stores inventory is automatically ordered through the store's computer system. (*Hodges Dep.* p. 83). However, Eckerd did not implement the practice until recently (after Plaintiffs' employment was terminated), and the practice is therefore irrelevant to resolution of Defendant's Motion. (*Id.*).

CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

entirely clear from the record. It is undisputed that store managers must follow "planograms" developed by Eckerd.[10]  (*Posely Aff.* ¶ 3h; *Bloomfield Aff.* ¶ 2h; *Bloomfield Dep.* pp. 75-76). The planograms serve as a type of map, dictating the type, amount and location of a store's products. (*Posely Dep.* pp. 73-74). There is a separate planogram for each section of the store, i.e., photo lab, pharmacy and front end.  (*Neville Dep.* p. 25).  While the existence of, and need to follow, planograms is not in dispute, the record is unclear as to the extent to which the planograms allow managers to exercise discretion over certain aspects of store presentation and the extent to which a manager may deviate from a planogram if he/she believes it is necessary.

The record suggests, for example, that store managers have more discretion in ordering a store's promotional merchandise than they have over other merchandise carried by their stores. (*McGinnis Dep.* p. 90; *Neville Dep.* 20-21).[11]  Patricia Neville, a front-end supervisor, testified that store managers may recommend changes to the planograms, but may not unilaterally alter the planograms. (*Neville Dep.* p. 19).

### *Financial Responsibilities*

Store managers are responsible for each store's profit and loss statement. (*McGinnis Dep.* p. 67). They also handle all cash taken in by their stores and are responsible for depositing the cash in the bank (although other store employees often make bank deposits). (*Sidman Dep.* pp. 53-54). They are responsible for maintaining and accurately reporting the cash received by their stores. (*See*

---

[10] Planograms are schematics for each store that lay out "where each item, each piece of merchandise goes." (*McGinnis Dep.* p. 31). Planograms are constantly being updated. (*Bloomfield Dep.* p. 76).

[11] Neville also testified that the manager "[m]akes the call on the vendor type merchandise." (*Neville Dep.* p. 21).

*Id.*).  Store managers are also charged with minimizing shrinkage[12] at their stores, although all employees contribute to the effort.  (*See Posely Dep.* p. 66; *see also Hodges Dep.* pp. 40-41).

### Customer Relations

Store managers are intimately involved in customer relations.  "They have the authority to handle a customer issue by giving away product, by reducing prices, by authorizing price reductions." (*Sidman Dep.* p. 20).  When the store manager is present, he or she is the sole person with the ability to reduce or refund the price of a product.  (*Posely Dep.* pp. 48-49; *Bloomfield Dep.* pp. 54, 83-84).

### Photo Lab and Pharmacy

Store managers retain less control over their store's pharmacy[13] and photo lab.[14]  (*See Posely Dep.* p. 22).  Store managers also do not exercise any direct responsibility over the store pharmacist (*Id.* at p. 47).  However, they may make recommendations to the pharmacist.  (*Id.* at p. 40).  Moreover, they retain a role in hiring and supervising many of the pharmacy's employees.  (*See Colon Dep.* p. 41).  The store manager has access to the pharmacy's financials and also works to ensure that the pharmacy's personnel costs do not exceed budget.  (*Colon Dep.* pp. 37-39).

### Manual Labor

Store managers must perform many of the same tasks as those performed by their subordinates, such as straightening the shelves, cleaning spills, and operating the cash register.  (*See*

---

[12] "Shrinkage" is the reduction in a store's inventory caused by theft.

[13] Revenues from the store pharmacies account for approximately 70% of the total revenues generated by a store.  (*Goodrich Dep.* p. 40).

[14] Each Eckerd retail store is essentially divided into three sections, the pharmacy, the photo lab and the front-end.  At the district level, there is a person charged with supervising the front-end and photo lab sections and another person charged with supervising the pharmacy sections.  Each of these supervisors reports to the district manager. (*Goodrich Dep.* p. 5).  Eckerd develops separate sales projections for each of the three areas.

*McGinnis Dep.* pp. 74-76; *see also Posely Dep.* pp. 69-71). In fact, the managerial job description lists performance of "duties of subordinates" as part of the job. (*Position Description*)(Def. App. Ex. 1). When managers are not performing administrative/financial duties, they are expected to spend the remainder of their days on the sales floor. (*McGinnis Dep.* p. 82). Likewise, managers are often forced to physically unload the delivery trucks. (*Bloomfield Dep.* pp. 71-72; *Razack Dep.* p. 27).

The percentage of time that a manager spends performing various tasks on the floor varies depending upon a number of different factors. (*McGinnis Dep.* pp. 86-87). However, opt-in Plaintiff Brazeau testified that "even though [he] may be doing some cleaning or stocking, he still [wore] the supervisor cap." (*Brazeau Dep.* pp. 23; *see also id.* at p. 43).

**Work Parties**

Plaintiffs' opposition to Defendant's Motion focuses extensively upon the existence and content of "work parties." A "work party" is an event, scheduled by the district manager (or front-end supervisor), during which a group of employees congregates at an Eckerd store for the purpose of upgrading the condition of the store. (*McGinnis Dep.* p. 18). The practice has been employed by Eckerd for over two decades. (*Sidman Dep.* p. 37). Work parties generally occur: (1) after a manager has been terminated, (2) in order to prepare for a visit from corporate headquarters, (3) to prepare/conduct a store's annual inventory review, (4) to transition a store from one season to the next, or (5) to prepare a new store. (*See, e.g., Goodrich Dep.* p. 34; *Hodges Dep.* p. 133). McGinnis testified that upgrading substandard stores accounted for approximately 70% of the work parties, and seasonal transitions accounted for approximately 30% of the work parties. (*McGinnis Dep.* p. 24).

The number of employees at a work party generally ranges from five to thirty, (*McGinnis Dep.* p. 18), however there is no minimum number of persons who may attend a work party.

(*Hodges Dep.* p. 109). Work parties may be attended by store managers, assistant managers, and/or hourly employees. (*McGinnis Dep.* p. 88). The record suggests, however, that work parties are primarily attended by managers and are only attended by subordinates when a store's manager is unavailable. (*See Goodrich Dep.* p. 33; *Harris Dep.* pp. 38, 40).

Within his 200-store region, McGinnis testified that there would typically be approximately 12-20 major work parties and 6-10 smaller work parties per year. (*McGinnis Dep.* at p. 20). While the purpose of the larger work parties was to upgrade the condition of the store, the purpose of the smaller work parties was to transition the store from one season to the next. (*See McGinnis Dep.* pp. 23-24). Eckerd contends that in any given year, an employee would not work any more than three to six work parties; however it did not estimate the number of work parties attended by store managers. (*Id.* at p. 23). Plaintiffs maintain that they attended approximately twelve work parties per year during the course of their employment. (*Posely Aff.* ¶ 31; *Bloomfield Aff.* ¶ 21). Razack, a current store manager, testified that he participated in twenty work parties. (*Razack Dep.* p. 29).[15]

Regardless of the precise number of work parties that were held annually, the record suggests that work parties were a fairly regular occurrence. (*See, e.g.,* Plain. Exs. [D.E. 314] 20, 21). The record also indicates that Eckerd maintained some type of central mechanism for planning the work parties, that is, they were generally not planned by store managers. (*See* Plain. Exs. 19, 22, 24, 30; *Neville Dep.* p. 104).[16] District managers typically planned the work parties. (*McGinnis Dep.* p. 89).

---

[15] It is not entirely clear whether Razack was referring to the number of annual work parties he attended or the total number of work parties he attended throughout his employment with Eckerd.

[16] At least one email also indicates that Eckerd established "guidelines" pursuant to which work parties operated. (*See* Plain. Ex. 30).

Although McGinnis testified that work parties were a "normal job duty" of Eckerd managers (*McGinnis Dep.* p. 21), attendance at work parties is not listed as one of the functions of store managers in Eckerd's "position description." (*See Position Description*).

Eckerd claims that work parties typically varied in length from four to twelve hours. (*McGinnis Dep.* p. 50). However, at least one email suggests that work parties lasted as long as fifteen hours. (Plain. Ex. 16).

Plaintiffs' attendance at work parties was mandatory; Plaintiffs contend that failure to attend would subject them to discipline or even dismissal. (*Posely Aff.* ¶ 3m; *Bloomfield Aff.* ¶ 2m). The record, however, does not provide any indication that managers were actually terminated for their failure to attend work parties. According to Joe Goodrich, a district manager, the failure to attend was inconsequential and, at most, would subject a manager to a reprimand. (*See Goodrich Dep.* p. 41). Similarly, Patricia Neville, a front-end supervisor, claims that although a manager could be subject to a reprimand for not attending a work party without calling in advance, she has never faced such a situation. (*Neville Dep.* pp. 112-13).

While at the work parties, store managers had no indicia of authority and were forced to follow the directives of the district manager or his/her designee. (*Posely Aff.* ¶ 3o; *Bloomfield Aff.* ¶ 2o; *Razack Dep.* p. 32). In fact, when store managers worked alongside hourly employees at work parties, all performed the same tasks. (*Posely Aff.* ¶ 3q; *Bloomfield Aff.* ¶ 2q). In other words, at the work parties, the store manager's sole duty was to perform manual labor. (*See* Plain. Exs. 26, 27; *Goodrich Dep.* pp. 38-39; *Harris Dep.* p. 43; *Neville Dep.* pp. 74-78).[17]

---

[17] Eckerd also claims that work parties were designed for the purpose of training the employees of the store at which the work parties occurred and to allow managers to exchange operational ideas with each other. (*McGinnis Dep.* pp. 36-37; *see also Neville Dep.* p. 55). However, for the purposes of this Motion, the undersigned assumes that

Plaintiffs were salaried employees and did not receive any additional compensation for their attendance at work parties. (*McGinnis Dep.* p. 21; *Razack Dep.* p. 52; *Colon Dep.* p. 67; *Waite Dep.* pp. 31-34). Likewise, managers did not receive less compensation when they attended work parties, as they received the same salary regardless of the number of hours they worked in any given week. (*Posely Dep.* p. 82, 102; *Waite Dep.* p. 33). Store managers were never promised that they would receive additional compensation, apart from their normal salaries, for attending work parties. (*McGinnis Dep.* p. 107; *Bloomfield Dep.* p. 79; *Waite Dep.* pp. 33-34; *Razack Dep.* p. 53).

When a work party was scheduled, store managers would attend the work party instead of working at their own stores on that day. (*Posely Dep.* pp. 78-79; *Bloomfield Dep.* p. 79). Managers were randomly assigned to work parties based upon need and there was no effort to schedule work parties on a manager's day off. However a work party could potentially occur on a manager's scheduled day off. (*McGinnis Dep.* pp. 50-51).

Several emails suggest that an effort was made to conceal the existence, and the nature, of work parties. (*See* Plain. Exs. 1-6).[18] One email from October 2002 states "[f]or future reference never put anything about a work party on e-mail." (Plain. Ex. 1; *see also* Plain. Ex. 3 ("Make sure that all expense reports do not reference work parties as a reason for the expense"); Plain. Ex. 4 ("We do not want to see work party, work party for corporate visit, etc. on the reports.")). Another Eckerd email suggests that Eckerd viewed the utilization of salaried managers, rather than hourly

---

the primary purpose of the work parties was the performance of manual labor by managers of other stores. Moreover, the testimony of Meshon Harris, a current store manager, directly contradicts Eckerd's contention. (*Harris Dep.* pp. 43, 48).

[18] The purpose of the concealment effort is unclear.

employees, at work parties as a means to save money (at least for the individual store's payroll). (Plain. Ex. 9).

## II. ANALYSIS

Eckerd seeks summary judgment on all counts of Plaintiffs' Second Amended Complaint. [D.E. 30]. Specifically, Eckerd contends that it has fully complied with the requirements of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and that Plaintiffs' state law claims are without merit.

### A. Summary Judgment Standard

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555, 1558 (11th Cir. 1990).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)(emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual

CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

## B.    FLSA Overtime Claims (Counts I-III)

The Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, provides that employers must compensate employees at a rate of one and one half times their regular rate of pay for each hour worked in excess of forty hours per week. 29 U.S.C. § 207(a). "[A]ny employee employed in a bona fide executive . . . capacity" need not receive overtime compensation in accordance with the requirements of 29 U.S.C. § 207(a). 29 U.S.C. § 213(a)(1). The question currently before the Court is whether Plaintiffs are "bona fide executives" within the meaning of the FLSA.

The FLSA authorizes the Department of Labor to develop regulations defining and implementing the executive and other exemptions. *See* 29 U.S.C. § 213(a). Where Congress expressly delegates regulatory authority to an administrative agency, regulations adopted pursuant

15

CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

to such authority "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). Accordingly, the Department of Labor's implementing regulations guide the Court's analysis, and the parties do not suggest otherwise.

As an initial matter the undersigned notes that the Department of Labor regulations governing the FLSA executive exemption were revised effective August 24, 2004. However, because Plaintiffs' employment with Eckerd terminated, and the case was filed, prior to the effective date of the new regulations, the regulations in effect at the time of Plaintiffs' termination are applied. This is consistent with the approach taken by other courts. *See, e.g., Bagwell v. Florida Broadband, LLC*, 385 F. Supp. 2d 1316, 1322 n.5 (S.D. Fla. 2005)(applying prior interpretations and regulations where employment terminated, and complaint was filed, prior to August 23, 2004); *Johnson v. Target Corp.*, No. 05-Civ-153, 2006 WL 572014, at *4 n.1 (E.D. Tenn. March 8, 2006)(applying revised regulations where employment terminated, and case was filed, following revision); *Casto v. Royal Oak Industries, Inc.*, No. 04-Civ-195, 2006 WL 322485, at *3 n.6 (W.D. Mich. Feb. 10, 2006)(same); *McDowell v. Cherry Hill Tp.*, No. 04-Civ-1350, 2005 WL 3132192, at *6 n.7 (D.N.J. Nov. 21, 2005); *Jackson v. McKesson Health Solutions, LLC*, No. 03-Civ-11177, 2004 WL 2453000, at *4 n.7 (D. Mass. Oct. 29, 2004)(same); *Belt v. EmCare, Inc.*, 351 F. Supp. 2d 625, 631-32 (E.D. Tex. 2005)(same); *Smith v. Heartland Automotive Services, Inc.*, 404 F. Supp. 2d 1144, 1148 n.2 (D. Minn. 2005)(noting that members of proposed class would be subject to different regulations depending upon their termination date). Indeed, the parties have not squarely addressed the issue or suggested that the new regulations should apply.

Pursuant to the relevant regulations, an employee's executive status, or lack thereof, is

CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

determined under either the "short test" or the "long test," depending upon the employee's salary.

*See, e.g., Nicholson v. World Business Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1997). If an

employee earns a weekly salary of $250 or more, the "short test" applies. *See Wagner v. Murphy Oil*

*USA, Inc.*, 139 Fed. Appx. 131, 132 (11th Cir. 2005). Under the "short test,"

> The term employee employed in a bona fide executive . . . capacity in section 13(a)(1) of the Act shall mean any employee:
>
> (a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and
>
> (b) Who customarily and regularly directs the work of two or more other employees therein; . . . .

29 C.F.R. § 541.1.

There is no dispute that Plaintiffs earned a salary of over $250 per week during the relevant

time periods, and Plaintiffs do not dispute Eckerd's position that Plaintiffs regularly supervised two

or more store employees.[19] Thus, the only question before the Court is whether Plaintiffs' "primary

duty" was management of the store. *See id.* The Court undertakes the inquiry mindful of its duty

to narrowly construe any exemptions against the employer who asserts them. *Jeffery v. Sarasota*

*White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995)(citations omitted).

    1.    In the Absence of Work Parties, Plaintiffs' Primary Duty was Management.

The "short test" inquiry requires a determination of, first, whether Plaintiffs performed

"management" activities and, second, whether management was the "primary duty" of store

managers. That Plaintiffs were given the title of "managers" by Eckerd is irrelevant as "the

---

[19] Felix Hodges, a district manager, testified that all store managers have at least 80 subordinate hours of help. (*Hodges Dep.* pp. 164-65). Plaintiffs have not set forth any evidence or argued to the contrary.

regulations specifically require an examination beyond an employee's title to the specific duties performed by the employee." *Wagner*, 139 Fed. Appx. at 132 (citing 29 C.F.R. §§ 549.102, 549.103).

The regulations note that courts should typically be able to identify employees who perform supervisory work with relative ease. 29 C.F.R. § 541.102(a). However, the regulations provide additional guidance as to the meaning of "management" in more difficult cases, such as the situation presented here.

> [I]t is generally clear that work such as the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under him: Interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

29 C.F.R. § 541.102(b).

Plaintiffs do not contest that as store managers, they performed many of the activities described. However, they contend that they spent as much as 80% of their time performing non-exempt tasks, tasks identical to those performed by hourly, non-exempt store employees.[20] Thus, Plaintiffs conclude that notwithstanding what they maintain was their infrequent performance of managerial tasks, management was not their primary duty and the regulations compel a finding that

---

[20] In his deposition, and in slight contradiction to his affidavit, Posely testified that he spent 75% of his time performing non-exempt work. (*Posely Dep.* p. 97).

CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

they are non-exempt employees.

Although "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time . . . [t]ime alone . . . is not the sole test" to determine an employee's status. 29 C.F.R. § 541.103. The regulations provide that

> in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

29 C.F.R. § 541.103.

Of particular importance to the present question, the regulations recognize that an employee may have responsibilities similar to those of the owner or manager of an establishment although the employee spends more than 50 percent of his or her time performing production or sales work. *Id.* Management will still be an employee's primary responsibility if, in the course of performing production or sales work, the employee " supervises other employees, directs the work of warehouse and delivery men, approves advertising, orders merchandise, handles customer complaints, authorizes payment of bills, or performs other management duties as the day-to-day operations require." *Id.*

Plaintiffs argue that although they are deemed "managers" by Eckerd, management was not their primary duty because (1) they performed non-exempt labor approximately 80% of the time; (2) their discretion was severely constrained by Eckerd's corporate policies; (3) they were supervised by district managers, who were the true managers of each store; and (4) they were forced to perform manual labor at work parties, at which they were stripped of any indicia of authority. Courts have

19

CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

routinely rejected arguments that the presence of the first three factors negates the exempt status of retail store managers.

In *Donovan v. Burger King Corp.*, 672 F.2d 221 (1st Cir. 1982)("*Burger King I*"), the Secretary of Labor initiated suit against Burger King, alleging that its assistant managers were entitled to overtime compensation. Burger King argued that the assistant managers were exempt bona fide executives who were not entitled to overtime compensation. Similar to Plaintiffs here, the assistant managers were charged with assigning work, overseeing product quality, training employees, determining the quantity of food to be produced at a given time, and performing various record keeping tasks. *Id.* at 223. However, the assistant managers' discretion was strictly circumscribed by instructions contained in Burger King's corporate manuals. *Id.*

The First Circuit held that supervising other employees was clearly a management duty and further found that the need to comply with corporate policies, spelled out in "great detail," did not negate the conclusion that "management" was the primary duty of the assistant managers. *Id.* at 226. The court further found that "[e]nsuring that company policies are carried out constitutes the very essence of supervisory work." *Id.* (internal quotations, citations omitted). Finally, it held that the regulations make it "quite clear that an employee can manage while performing other work, and that this other work does not negate the conclusion that his primary duty is management." *Id.* at 227.

In a nearly identical case, *Donovan v. Burger King Corp.*, 675 F.2d 516 (2d Cir. 1982)("*Burger King II*"), the Second Circuit also concluded that assistant managers at Burger King were exempt under the "short test." The Second Circuit's discussion of the relationship between a manager's need to follow detailed corporate policies and her FLSA status is instructive here:

> We fully recognize that the economic genius of the Burger King enterprise lies in

20

> providing uniform products and service economically in many different locations and that adherence by Assistant Managers to a remarkably detailed routine is critical to commercial success. The exercise of discretion, however, even where circumscribed by prior instruction, is as critical to that success as adherence to "the book." Burger King, of course, seeks to limit likely mistakes in judgment by issuing detailed guidelines, but judgments must still be made. In the competitive, low margin circumstances of this business, the wrong number of employees, too many or too few supplies on hand, delays in service, the preparation of food which must be thrown away, or an underdirected or undersupervised work force all can make the difference between commercial success and failure.

*Id.* at 521-22. Thus, the First and Second Circuits were quite clear that managers of franchise retail establishments were exempt employees, notwithstanding their performance of non-exempt work and their need to follow corporate policies that limited their discretion.

The Eighth Circuit reached a similar conclusion in *Murray v. Stuckey's Inc.*, 939 F.2d 614 (8th Cir. 1991). In *Stuckey's*, plaintiffs, who were managers of combination gasoline stations, restaurants and convenience stores, raised arguments almost identical to those asserted by Plaintiffs in this case. They claimed that they were improperly classified as exempt because (1) they spent 65-90 percent of their time performing non-exempt work; (2) they had to answer to regional managers who were the "true managers" of the store; (3) Stuckey's standardized many aspects of the stores' operations, performing many store functions at the corporate level; and (4) other employees shared the management responsibilities.

In overturning the district court's ruling that the managers were non-exempt, the court found the above factors to be irrelevant to the determination of whether management was the "primary duty" of the managers. Specifically, it held that "the primary duty of a local store manager is no less managerial because the store manager reports to a distant regional manager whose primary duty is to manage multiple stores at a higher level within the organization." *Id.* at 619. Ultimately, the court

held that "it [was] undisputed that the plaintiff store managers were the on-site employees ultimately responsible for the stores' operations, even though their discretion was circumscribed. Thus, their responsibilities placed them squarely within the dictates of the above regulation, as construed by *Burger King* and other decisions dealing with comparable multi-store operations." *Id.* at 620.[21]

Indeed, as noted by Defendant, the case law is replete with decisions holding managers of retail establishments to be exempt, notwithstanding the fact that they spent the majority of their time performing non-exempt tasks or their need to obey corporate policies and/or follow the orders of their corporate superiors. *See, e.g., Jones v. Virginia Oil Co.*, 69 Fed. Appx. 633 (4th Cir. 2003)(*per curiam*)(manager of Dairy Queen and convenience store exempt although she spent 75-80% of her time performing tasks such as cooking, cleaning and operating the cash register because, while performing the non-exempt tasks, she was simultaneously performing managerial tasks); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104 (9th Cir. 2001)(managers at recreational vehicle park who spent 90% of time performing non-exempt work, and who received one to two visits per month from supervisors, were exempt); *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268 (S.D. Fla. 2004)(manager of retail establishment who spent 95% of his time performing non-exempt tasks and who allegedly delegated managerial tasks to non-exempt employees held to be exempt, finding that "such delegation does not render the duties any less 'managerial'"); *Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323 (N.D. Ga. 2005)(assistant managers exempt although they spent 90% of their time performing non-exempt work because "such duties were performed simultaneously with

---

[21] On remand, the district court found that certain employees were non-exempt under the "long test." The Eighth Circuit again reversed the district court's judgment, holding that it had taken an overly narrow view of whether the employees supervised two or more employees and whether they customarily and regularly exercised discretionary power. 50 F.3d 564 (10th Cir. 1995).

their managerial functions"); *Mitchell v. Abercrombie & Fitch, Co.*, Nos. C2-04-306, C2-05-596, 2006 WL 942090 (S.D. Ohio March 31, 2006)(retail store managers, who performed nearly identical functions to those performed by Plaintiffs were properly classified as exempt); *Addison v. Ashland*, No. 04-CV-40085, 2006 WL 752761 (E.D. Mich. March 23, 2006)(service center managers who hired, fired, stocked inventory, etc. were exempt although they spent more than 50% of their time performing non-exempt tasks and were subordinate to area managers, noting that it was the service center managers, as opposed to the area managers, who ran the store's day-to-day operations); *Haines v. Southern Retailers, Inc.*, 939 F. Supp. 441 (E.D. Va. 1996)(store manager exempt under FLSA although she spent significant amount of time performing non-exempt work and had limited discretion in managing the store); *Meyer v. Worsley Companies, Inc.*, 881 F. Supp. 1014 (E.D.N.C. 1994)(retail store manager exempt, notwithstanding need to perform all activities of non-exempt employees and argument that manager "simply was another shift worker who worked more hours than anyone else").

Try as they may, in the absence of work parties, Plaintiffs have failed to distinguish this case from the overwhelming and well-reasoned precedent holding that retail store managers who are charged with maintaining the proper functioning of their stores are exempt employees under the FLSA. The conclusion is consistent with the FLSA's implementing regulations. As noted, FLSA regulations instruct that, even where an employee spends more than 50% of his or her time performing non-exempt work, the executive exemption is still applicable where: (1) the employee's management duties are more important than other employment duties; (2) the employee frequently exercises discretionary powers; (3) the employee is relatively free from supervision, and (4) the employee's salary is greater than the salaries of his or her purported subordinates. *See* 29 C.F.R. §

541.103. The above conditions are present here.

On a day-to-day basis, managers are charged with handling, among other things, their individual stores' customer relations, appearance, loss prevention and cash intake. Store managers must determine, within Eckerd guidelines, the best way to carry out these functions. To this end, store managers retain a significant amount of control over store personnel, both in terms of hiring and supervising their activities. Moreover, managers must frequently exercise discretion to fulfill their duties.[22]

Store managers' need to exercise their discretion within the guidelines established by Eckerd does not undermine the importance of Plaintiffs' managerial duties or the discretion itself. *See Burger King I*, 672 F.2d at 226 ("[e]nsuring that company policies are carried out constitutes the very essence of supervisory work"). Moreover, that Plaintiffs often performed the same tasks as their subordinates in no way negates the importance of their managerial functions. *See Baldwin*, 266 F.3d at 1115 ("That the assistant managers may have performed some managerial tasks does not render the tasks nonexempt.")(citation omitted).

Plaintiffs were also relatively free from supervision. Although Plaintiffs reported to district managers and front-end supervisors, Plaintiffs were the parties most responsible for overseeing the day-to-day operations of their stores. Moreover, Plaintiffs did not report to any other employees within their stores.

---

[22] The limited authority that Plaintiffs exercised over the pharmacy portion of their stores (and over the pharmacist) does not affect the analysis. As discussed, if Eckerd stores lacked a pharmacy, management would undoubtedly be considered to be Plaintiffs' primary duty under the applicable case law. The presence of another, essentially separate, portion of the store, over which Plaintiffs exercised only limited control, does not negate Plaintiffs' managerial authority over the front-end. A different question would be presented if the pharmacists exercised authority over each store's front-end and/or over Plaintiffs.

Plaintiffs emphasize district manager Felix Hodges' statement that district managers (who supervised over 25 stores at any given time) "are responsible for the every day operations, profits and losses of each of those locations, managing the staff, store staff, insuring compliance of the company programs." (*Hodges Dep.* p. 29). While lending some support to Plaintiffs' position, the statement does not overcome the undisputed record testimony that store managers made the day-to-day decisions, even if district managers were ultimately held accountable for the results of those decisions. Nor does the statement overcome the impossibility of overseeing the daily operations of over twenty stores.[23] *See, e.g., Murray v. Stuckey's Inc.*, 939 F.2d at 619; *Abercrombie & Fitch*, 2006 WL 942090 at \*14 ("That District Managers regularly visited [manager's] store and retained authority to override certain of his management decisions did not undermine his day-to-day authority, as the highest ranking manager on job site, or render him non-exempt.").

The record pertaining to managers' salaries relative to the salaries of other store employees is not entirely developed. Plaintiffs argue that "[w]hen Eckerd assistant store managers are promoted to store manager, they gain a title but effectively lose pay. According to pay records provided by the Defendant, in her [sic] last two pay periods in which she [sic] earned overtime, Posely earned $1,431.79 and $1,781.51 respectively." (*Plaintiffs' Response Memo.* at 13). The record, however, does not support Plaintiffs' position.

First, the record demonstrates that, on average, Posely earned significantly more per week

---

[23] This case is therefore distinguishable from *Cowan v. Treetop Enterprises, Inc.*, 120 F. Supp. 2d 672 (M.D. Tenn. 1999), a case described by Plaintiffs as factually similar to the case at bar. In *Cowan*, the court held that unit managers at Waffle House were improperly classified as exempt where the unit managers were supervised by district managers who were responsible for managing *three* stores each. Thus, the district managers in *Cowan* were capable of playing a far greater role in the management of the restaurants' daily operations and staffing than are the district managers here.

once he became a salaried manager. (*See Posely Dep.* Ex. 1). Second, although Posely was given the title of "first assistant" during the time period in question, he testified that during the relevant time period he was the *de facto* manager, and was the highest ranking employee at his store. (*Posely Dep.* p. 17). Moreover, Patricia Neville testified that assistant managers earn between $350-700 per week whereas store managers earn between $700 to upwards of $1,100 per week (Ms. Neville was not sure of the maximum salary for managers). (*Neville Dep.* p. 147). Finally, store managers were eligible for bonuses. (*Bloomfield Dep.* p. 21; *Waite Dep.* p. 33).[24]

Thus, in the absence of work parties, this case presents the Court with a set of facts that is not novel, and, in accordance with the relevant statutory provisions and implementing regulations, has consistently been found to support Plaintiffs' classification as exempt employees.

### 2. Effect of Work Parties on the "Primary Duty" Analysis

Plaintiffs seemingly acknowledge that, in the absence of work parties, the case law is overwhelmingly against their position. They state that "work parties are an essential element of Plaintiffs' claim, and Defendant, despite having three (3) years to do so, has failed to provide even a single case that allows or even addresses work parties." (*Plaintiffs' Response Memo.* at 2). Likewise, Plaintiffs assert that "Eckerd relies on a series of cases that have held under the specific facts of those cases that a retail store manager was executive-exempt under the FLSA. The present case is readily differentiated from the Defendant's cases. Not a single case cited in Defendant's memorandum of law deals with a practice like 'work parties.'" (*Id.* at 3). Finally, Plaintiffs argue that "[t]he central factor which sets the present case apart from all previous FLSA overtime cases in

---

[24] Although not entirely clear from the record, it does not appear that other store employees were entitled to receive bonuses.

retail context is Eckerd's 'work party' practices." (*Id.* at 14).

Defendant maintains that the issue is essentially one of semantics. While no other company may employ the term "work party," according to the Defendant the practice is, for all intents and purposes, no different from the types of tasks routinely performed by exempt employees in the above-cited cases. The undersigned disagrees.

While the performance of non-exempt, manual tasks may constitute the bulk of the work performed by a retail store manager on the average day, in the above cases the non-exempt tasks were ancillary to the manager's primary managerial duties. The holdings were based, at least in part, upon the manager's ability to perform managerial functions while simultaneously performing non-exempt tasks.[25] As noted by Plaintiffs, the cases cited by Eckerd do not involve situations where a manager was stripped of all indicia of authority while performing the manual tasks.

To say that work parties have not been considered by other courts, however, does not answer the ultimate question of whether the practice alters the store managers' FLSA status. In other words, the Court must determine whether the factual distinctions presented here are legally relevant to Plaintiffs' exempt status.

Plaintiffs essentially advance the following arguments in support of their position that the existence of work parties is a dispositive factor in the exemption analysis: (1) the exemption analysis

---

[25] At oral argument, Eckerd suggested that store managers were still capable of performing managerial tasks, i.e., receiving phone calls from their stores' employees and resolving pressing issues, while participating in work parties. Strictly speaking, and particularly in light of recent technological advances, managers may always be "on call" to exercise their managerial duties. However, the mere possibility that a manager may be required to perform a managerial function upon receipt of a phone call or email does not transform manual labor, performed at the direction of another, into a managerial task. Indeed, Eckerd's logic would transform all tasks performed by a manager, including eating, sleeping, vacationing, etc., into managerial tasks, as the manager would never relinquish his or her status as "captain of the ship."

CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

is a fact-intensive inquiry and, given the other facts in the record, the work party practice sufficiently alters the overall "primary duty" calculus so as to compel a finding that Plaintiffs are non-exempt; and (2) Eckerd's use of work parties is an attempt to evade the policies underlying the FLSA for which Eckerd should not be rewarded.

a.      Effect on Factors

"The question whether or not a particular employee is exempt from the minimum wage and maximum hours provisions of F.L.S.A. because of his employment in an 'executive' or 'administrative' capacity is one of fact, to be determined on a case-to-case basis from all of the circumstances." *Dye v. Family Market, Inc.*, No. 81-1331, 1982 WL 19205, at *4 (10th Cir. Feb. 22, 1982)(citing *Walling v. General Industries Co.*, 330 U.S. 545 (1947)). Thus, Plaintiffs argue that it is not enough for Eckerd to demonstrate that Plaintiffs' job duties are similar to the job duties of retail store managers found to be exempt in other cases because here the Court must consider a new factor, Plaintiffs' need to participate in work parties.

Although the precise number of work parties in which Plaintiffs participated is not known, neither Posely nor Bloomfield claims to have attended, on average, more than twelve "work parties" per year. (*Plaintiffs' Interrog. Responses* ¶ C; *Posely Aff.* ¶ 31; *Bloomfield Aff.* ¶ 21)). Furthermore, they claim that they worked approximately eight hours per work party. (*Plaintiffs' Interrogatories Responses* ¶ C). Accepting Plaintiffs' contention that they worked 70 hours per week (*id.*), and assuming that they worked 50 weeks per year, Plaintiffs spent less than three percent of their working hours at work parties. Thus, as a percentage of total hours worked, the amount of time dedicated to work parties is relatively minuscule.

The regulations provide that "[a]ny *employee* employed in a bona fide executive . . . capacity"

28

is exempt from the overtime requirements of the FLSA. 29 U.S.C. § 213(a)(1)(emphasis added).
To this end, the regulations require courts to examine the totality of an employee's functions to
determine if management is his or her "primary duty." *See* 29 C.F.R. § 541.103. Congress could
have created a scheme requiring courts to analyze each job task performed by an employee to
determine whether *such task* is managerial. Instead, however, Congress chose "employees," as
opposed to employment functions or tasks, as the operative unit of analysis.

As discussed extensively, Plaintiffs had significant managerial responsibilities over their home
stores, responsibilities that have been consistently held to entitle employers to the executive
exemption. Spending less than 3% of their time in a non-managerial role does not negate the
managerial, discretionary functions Plaintiffs performed at their own stores on a daily basis. Nor is
the amount of time significant enough to compel a different outcome in the "primary duty" analysis.[26]

Likewise, the undersigned is not persuaded by Plaintiffs' argument that employing the work
party practice signifies that Eckerd principally valued Plaintiffs as manual laborers. Plaintiffs rely
upon *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990), for the proposition that an
"employee's primary duty will usually be what she does that is of principal value to the employer, not
the collateral tasks that she may also perform, even if they consume more than half her time."
Plaintiffs then conclude that, because managers who attended work parties were "charged out" as

---

[26] The undersigned recognizes the danger in relying solely upon prior precedent in answering the novel
question currently before the Court. As noted, the FLSA calls for an "all or nothing" determination of whether an
employee is exempt, rendering it impossible to determine whether the ultimate resolution in past cases was a close call
such that employing a practice such as work parties may tip the balance and compel a different result. The regulations,
however, specifically contemplate that an employee who has "broad responsibilities similar to those of the owner or
manager of the establishment" has management as his or her primary duty even though he or she "spends more than
50 percent of his [or her] time in production or sales work." 29 C.F.R. § 541.103. Thus it appears that retail store
managers fall squarely within the executive exemption; a conclusion that is not altered by Eckerd's requirement that
managers occasionally attend work parties.

hourly associates, their principal value to Eckerd was as hourly laborers. Plaintiffs' argument, however, ignores the fact that store managers supervise hourly associates and assistant managers at all times other than when they are attending work parties.[27] The argument similarly ignores Plaintiffs' authority to hire hourly employees and Plaintiffs' significant authority over the terms and conditions of their subordinates' employment. It is paradoxical, indeed (and contrary to the record), to argue that, notwithstanding their supervisory authority over hourly employees, and the vast differences in their respective terms of employment, Plaintiffs were essentially treated and valued as hourly employees.

The undersigned does not suggest that requiring managers (or similarly situated supervisors) to participate in work parties, or similar practices, is irrelevant to the executive exemption analysis, nor that the employment of such practices may never be determinative. As Plaintiffs suggested at oral argument, this holding could potentially create a "slippery slope" whereby employers may slowly, but persistently, chip away at the executive exemption. Of course, courts only resolve the issues before them and the undersigned need not determine when such practices go too far; suffice it to say that Eckerd has not crossed the proverbial line in this case.

The undersigned notes, however, that a contrary holding could produce equally (albeit converse) undesirable consequences. In other words, a ruling that Eckerd's managers are not exempt because they participate in approximately one work party per month could potentially create a FLSA regime whereby an exempt employee could prosecute a FLSA suit each time he or she is asked to

---

[27] The undersigned assumes, without deciding, that an employer's internal accounting mechanisms may be relevant to the "primary duty" inquiry.

perform a non-exempt function that is not strictly part of the job description. The statutory language, regulations and case law indicate that Congress did not contemplate such a regime.

Thus, store managers' attendance at work parties does not compel the conclusion that management is not their "primary duty" where the other facts in the record overwhelmingly suggest otherwise.

b.    Punitive Measure

Plaintiffs also argue that Eckerd should not be rewarded for its obvious attempts to evade the requirements of the FLSA. Plaintiffs do not identify any provisions of the FLSA, or its implementing regulations, that permit courts to essentially punish employers when they employ allegedly evasive tactics. Instead, they cite the Court's duty to narrowly construe any exemptions against the employer, and Eckerd's burden to demonstrate that it is entitled to the exemption, in support of their argument. *Sarasota White Sox*, 64 F.3d at 594 (citations omitted). Recognizing that FLSA exemptions must be narrowly construed against employers, however, is far different from finding that a court may deny an exemption as a punitive measure whenever it believes an employer utilizes practices intended to reduce its overtime liability.

Plaintiffs essentially ask the Court to add a scienter element to the FLSA exemption analysis. Alternatively stated, Plaintiffs invite the undersigned to inquire into the motivation for Eckerd's employment practices in determining whether Eckerd is entitled to the exemption. The undersigned declines the invitation.

The regulations contemplate that employers may require exempt employees to perform non-exempt tasks. Indeed, they presume that an employee is exempt even where he or she spends as much as 50% of the time performing non-exempt tasks. *See* 29 C.F.R. § 541.103. Moreover, the

regulations acknowledge that an employee may be exempt even where non-exempt work takes up more than 50% of the time. *See id.* When an exempt employee is required to perform non-exempt work, as is explicitly permitted by the FLSA regulations, employers are presumably motivated, at least in part, by a desire to avoid paying overtime compensation. The "short test," however, requires courts to consider whether management is an employee's primary duty, not the purpose for requiring employees to perform ancillary duties.

To the extent that Plaintiffs believe they have identified a loophole in the FLSA and its implementing regulations (an argument to which the undersigned is not unsympathetic) their arguments would be more appropriately directed at Congress or the Department of Labor.

## C.    Minimum Wage Claims (Counts III, VI, IX)

Counts III, VI and IX allege that Eckerd violated the minimum wage provisions of the FLSA. The FLSA provides that "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at" a rate of not less that $5.15 per hour. 29 U.S.C. § 206(a). Plaintiffs concede that when dividing their total weekly compensation by the total number of hours they worked in any given week, they never received less than $5.15 per hour. Nevertheless, Plaintiffs argue as follows:

[I]f "[sic] work parties are part of the job as a manager, then the job involves a dual function and qualifies them as "working foreman" [sic] under the dual employment provisions of the regulations (29 C.F.R. sec. 541) and [sic] are not exempt *bona fide* executives.

If the "work parties" are a separate job to which the Plaintiffs were laborers, then they are entitled to at least minimum wage for their labor. Eckerd cannot have it both ways, [sic] either its use of "work parties" disproves the claim to an exemption or requires it to compensate the people who performed manual labor at "work parties" at least at minimum wage level.

(*Plaintiffs' Response Memo.* at 19-20). Plaintiffs' argument, for which they provide no legal support, does not persuade.

Accepting, for the sake of argument, the dubious proposition that the "working foremen" provisions ever apply under the "short test,"[28] Plaintiffs' argument ignores the possibility that store managers are charged with the task of participating in work parties, a task that does not affect the managers' status as exempt employees. Plaintiffs essentially argue that a salaried employee, paid the same weekly salary regardless of the number of hours worked or the types of tasks performed, is, in reality, only being compensated for certain tasks. Thus, they conclude that a court may determine which of those tasks are covered by the employee's base salary and then award compensation to the

---

[28] Plaintiffs' argument is predicated, in part, upon the applicability of the "working foremen" provisions to their situation. It does not appear, however, that the "working foremen" provisions apply under the "short test." The "working foremen" regulations state that "[t]he primary purpose of the exclusionary language placing a limitation on the amount of nonexempt work is to distinguish between the bona fide executive and the 'working' foreman or 'working' supervisor who regularly performs 'production' work or other work which is unrelated or only remotely related to his supervisory activities." 29 C.F.R. § 541.115(a). However, the "short test" is only concerned with whether an employee's "primary duty" is management and does not place any limitation upon the amount of time he or she may spend performing non-exempt work.

Conversely, the "long test" places a limit upon the number of hours that an exempt employee may spend performing non-exempt tasks. *See* 29 C.F.R. § 541.1(d). Thus, the reference in the working foreman regulation to the "limitation on the amount of nonexempt work" could only logically apply to the "long test." Indeed, in a well-reasoned opinion, the Tenth Circuit reached an identical conclusion. *See Hays v. City of Pauls Valley*, 74 F.3d 1002 (10th Cir. 1996). The *Hays* court's analysis is instructive:

[T]he working foreman provision is merely an explanation of the long test's limitation on nonexempt work described in 29 C.F.R. § 541.1(e). The introductory paragraph of the working foreman provision refers to the long test limitation on nonexempt work, indicating that the working foreman provision applies only to the long test. . . . In addition, the 20 percent limitation on nonexempt work described in the working foreman provision is identical to the 20 percent limitation on nonexempt work in the long test, 29 C.F.R. § 541.1(e); and the subsection defining the 20 percent limitation in the long test, 29 C.F.R. § 541.112, also defines the 20 percent limitation in the working foreman provision, 29 C.F.R. § 541.115(b). These aspects of the working foreman provision indicate that Congress intended the provision to be a caveat to the requirements of the long test. The provision does not apply to the short test.

*Id.* at 1008. *See also Martin v. Tango's Restaurant, Inc.*, 969 F.2d 1319 (1st Cir. 1992)(high salaried employees not subject to percentage limitation on non-exempt work).

employee for any tasks performed for which he or she is not compensated by the base salary.

Plaintiffs, however, provide no support in the regulations or case law for their contention. Moreover, they provide no principled basis by which a court may determine when a particular task should be deemed to be a part of an employee's job, for which the weekly salary provides compensation, and when it should be considered a separate job.[29]

A different question would be presented if Plaintiffs had been promised additional compensation for their participation in work parties. Also, the record does not suggest that Plaintiffs were systematically forced to participate in work parties in addition to the hours they spent in the store. In other words, many Plaintiffs testified that they often attended work parties as opposed to working at their home stores. Finally, Plaintiffs do not contend that they received less compensation during the weeks that they attended work parties.

Accordingly, Plaintiffs' minimum wage claims fail.

### D.     Unpaid Wages (Counts IV, VII, X)

Plaintiffs also assert novel claims for unpaid wages under Florida law. They claim that they are entitled to additional compensation for each hour worked at a work party in excess of ten hours. Section 448.01, Fla. Stat., provides:

> (1) Ten hours of labor shall be a legal day's work, and when any person employed to perform manual labor of any kind by the day, week, month or year renders 10 hours of labor, he or she shall be considered to have performed a legal day's work, unless a written contract has been signed by the person so employed and the employer, requiring a less or greater number of hours of labor to be performed daily.

---

[29] While the Court's analysis is limited to the record in this case, the broader implications of Plaintiffs' argument are troubling. Indeed, any aggrieved employee would be capable of asserting a minimum wage claim by alleging that he or she was forced to perform tasks outside the purview of the primary job tasks, regardless of the employee's salary. Without any statutory basis, the undersigned is loathe to adopt a rule that would potentially impose such an onerous burden on courts and employers alike.

(2) Unless such written contract has been made, the person employed shall be entitled to extra pay for all work performed by the requirement of his or her employer in excess of 10 hours' labor daily.

Eckerd argues that the statute does not provide a private cause of action and that it is unconstitutionally vague.[30]

Typically, the questions of whether a statute creates a private right of action, and whether a statute is constitutionally vague, are entirely distinct. In determining whether a statute creates a private right of action, courts are primarily concerned with legislative intent. *See Ochab v. Morrison, Inc.*, 517 So. 2d 763 (Fla. 2d DCA 1987). The Florida supreme court has stated

Where a statute requires an act to be done for the benefit of another or forbids the doing of an act which may be to his injury, though no action be given in express terms by the statute for the omission or commission, the general rule of law is that the party injured should have an action; for where a statute gives a right, there, although in express terms it has not given a remedy, the remedy which by law is properly applicable to that right follows as an incident.

*Smith v. Piezo Technology and Professional Adm'rs*, 427 So. 2d 182, 184 (Fla. 1983)(quoting *Girard Trust Co. v. Tampashores Development Co.*, 95 Fla. 1010, 1015-16)).

Thus, whereas the inquiry into whether to imply a cause of action is concerned with the propriety of fashioning a judicial *remedy*, the vagueness inquiry is primarily concerned with a person's *right* to behave (or right to be treated) in a certain manner, and the liability or judicially enforceable right that may flow therefrom. Here, however, because the two inquiries are inextricably linked, i.e.,

---

[30] In its Motion for Summary Judgment, Eckerd also argues that Plaintiffs' unpaid wages claims are barred by the statute of limitations. Although Plaintiffs concede that a two year statute of limitations is applicable to the claims, and that the unpaid wages claims were not pled within the two-year period, they counter that the suit was initially filed within two years of Plaintiffs' last day of employment and that the amendment relates back to the initial filing. Eckerd does not address the argument in its Reply Memorandum and has thus apparently abandoned its position. Moreover, the undersigned concurs with Plaintiffs' position that the unpaid wages claims properly relate back to the date of the initial pleading as they "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2).

CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

the right to "extra pay" is indistinguishable from the remedy for an employer's failure to provide

"extra pay", the undersigned focuses exclusively upon the vagueness inquiry and does not reach the

question of whether Fla. Stat. § 448.01 would otherwise provide a private right of action.

Because there has been virtually no judicial interpretation of the statute, the undersigned

writes upon a virtual "blank slate." *Quaker Oats Co. v. Jewell*, 818 So. 2d 574 (Fla. 5th DCA 2002)

is the lone published decision identified by the parties, or the Court, that addresses the statute, and

it only does so in a perfunctory manner. In *Quaker Oats*, the Florida Fifth District Court of Appeal

affirmed the trial court's directed verdict against the plaintiffs, holding that the statute does not apply

to hourly employees. *Id.* at 575. In a footnote that was clearly identified as dictum, the *Quaker Oats*

court stated that "[w]hile not pertinent to [its] affirmance of the trial court, the statute needs to be

clarified by the Florida legislature. What constitutes 'manual labor'? What constitutes 'extra pay'?

A strong argument can be made that the statute is unconstitutionally vague." *Id.* n. 2.

Vague laws violate the due process clause of the Constitution. A statute is impermissibly

vague if (1) "it fails to provide people of ordinary intelligence a reasonable opportunity to understand

what conduct it prohibits;" or (2) "it authorizes or even encourages arbitrary and discriminatory

enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000)(citing *Chicago v. Morales*, 527 U.S. 41,

56-57 (1999)). As the Supreme Court has further explained:

> Vague laws offend several important values. First, because we assume that man is
> free to steer between lawful and unlawful conduct, we insist that laws give the person
> of ordinary intelligence a reasonable opportunity to know what is prohibited, so that
> he may act accordingly. Vague laws may trap the innocent by not providing fair
> warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws
> must provide explicit standards for those who apply them. A vague law impermissibly
> delegates basic policy matters to policemen, judges, and juries for resolution on an ad
> hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory
> application. Third, but related, where a vague statute abut(s) upon sensitive areas of

basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)(footnotes, internal quotations omitted).

It is well-established, however, that the degree of vagueness that the Constitution will tolerate, and the level of judicial scrutiny of a legislative enactment, depends largely upon the nature of the enactment in question. Section 448.01, Fla. Stat., is subject to extremely deferential judicial scrutiny because: (1) it is an economic regulation, *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982); (2) it does not impose criminal penalties, *id.* at 499; and (3) it does not infringe upon constitutionally protected rights. *Id.*

Moreover, because Fla. Stat. § 448.01 does not infringe upon First Amendment rights, the Court may only consider Defendant's vagueness challenge in light of the facts currently before the Court. *See id.* at 495 n.7 (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)("[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."). Thus, this Order only focuses upon whether the statute is vague as applied to Eckerd under the facts of this case, and offers no opinion as to whether the statute is impermissibly vague in all of its applications.

An economic regulation will not be invalidated unless it is "so vague and indefinite as really to be no rule or standard at all." *Seventh Street, LLC v. Baldwin County Planning and Zoning Com'n*, No 03-CV-00184, 2006 WL 531446, at *3 (11th Cir. 2006)(quoting *Seniors Civil Liberties Ass'n v. Kemp*, 965 F.2d 1030, 1036 (11th Cir.1992)); *see also Ford Motor Co. v. Texas Dept. of Transp.*, 264 F.3d 493, 507 (5th Cir. 2001)("An economic regulation is invalidated only if it commands compliance in terms so vague and indefinite as really to be no rule or standard at all . . .

37

or if it is substantially incomprehensible.")(citations, internal quotations omitted); *Record Head Corp. v. Sachen*, 682 F.2d 672, 676 (7th Cir. 1982)(same). "Economic regulations are subject to a less strict vagueness test, in part, because businesses are expected to consult the relevant regulations before undertaking any potentially offensive action and because a business "may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Flipside*, 455 U.S. at 498. Notwithstanding the deferential standard of review, Fla. Stat. § 448.01 still does not pass muster.

Section 448.01, Fla. Stat., provides that "[u]nless such written contract has been made, the person employed shall be entitled to extra pay for all work performed by the requirement of his or her employer in excess of 10 hours' labor daily." Florida law, however, does not define the term "extra pay." Likewise, the Court cannot ascertain, and Plaintiffs have not suggested, any principled means to apply the term to Plaintiffs.

It is doubtful, or at least unclear, whether salaried employees, who receive the same compensation regardless of the hours they work, are ever entitled to "extra pay" under the statute. Naturally read, the statute was most likely meant to apply to day laborers who are compensated on a daily basis. Even if the Court accepted the proposition that the statute placed employers on fair notice that salaried employees may be entitled to receive "extra pay," determining the amount of the "extra pay" to which Plaintiffs are entitled (and for which Eckerd is liable) would represent an unbridled exercise in judicial lawmaking. Is "extra pay" the average hourly wage when the statute was enacted in 1874; is it the "market rate" for employees performing similar tasks in the same geographic area; is it the federal minimum wage, a measurement that did not come into existence until 64 years after Fla. Stat. § 448.01 was passed? The rhetorical query demonstrates just how far the

Court must reach to give content to the statute.[31]

A different question would be presented if Fla. Stat. § 448.01 had been subject to judicial and/or administrative interpretations limiting or interpreting it. Courts are free to consider any limiting construction that a state court or enforcement agency has proffered. *Flipside*, 455 U.S. at 494 n.5. Thus, even where the words of a statute may be vague when considered in a vacuum, "potential vagueness may be mitigated by judicial or executive interpretation of the challenged provision." *Go Leasing, Inc. v. National Transp. Safety Bd.*, 800 F.2d 1514, 1525 (9th Cir. 1986). However, where a state court, or agency, fails to properly limit a statute or ordinance, federal courts "are without power to remedy the defects by giving the ordinance constitutionally precise content." *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 622 (1976)(citing *Smith v. Goguen*, 415 U.S. 566, 575 (1974)).

With the exception of *Quaker Oats*, a case whose holding is not pertinent to this case, Fla. Stat. § 448.01 has not been the subject of *any* judicial interpretation in over 130 years. Moreover, no administrative agency has cured the statute's defects. Quite to the contrary,

> According to the Florida Department of Labor, the term "manual labor" in § 448.01(2) has never been defined by administrative or judicial decision. Further, the Department's staff says that the provision is an antiquated one that would apply only to situations where an oral agreement is made for employment on a day-by-day basis.

3 Emp. Coord. Compensation § 21:57.[32]

---

[31] While vagueness challenges are typically concerned with "arbitrary or discriminatory" enforcement by executive agencies (i.e., the police), the dangers and infirmities of the possibility of arbitrary enforcement are no less grave when such enforcement is potentially practiced by the courts and/or private citizenry.

[32] No source has been identified for the Florida Department of Labor's staff's interpretation.

The Court is mindful of the presumption against finding a statute unconstitutionally vague as "[l]egislatures are ordinarily assumed to have acted constitutionally." *Clements v. Fashing*, 457 U.S. 957, 963 (1982). As has been noted, the presumption that legislatures act constitutionally is even stronger where an economic regulation is challenged for vagueness. Although rare, courts have, on occasion, stricken down economic regulations as unconstitutionally vague. *See, e.g.*, *Mike Naughton Ford, Inc. v. Ford Motor Co.*, 862 F. Supp. 264 (D. Colo. 1994)(statute prohibiting automobile manufacturers from establishing an additional franchise within a community unconstitutionally vague, although unclear as to whether it violated federal or Colorado constitution, or both); *Timpinaro v. S.E.C.*, 2 F.3d 453 (D.C. Cir. 1993)(suggesting, without deciding, that rule pertaining to securities traders may have been unconstitutionally vague).

The Court is wholly at a loss as to how it would instruct any jury, let alone on what standards would apply here at the summary judgment stage, on what constitutes "manual labor," and what constitutes "extra pay," and Plaintiffs have not suggested any potential instructions or applicable standards that could serve to cure the vagueness of this little, to never-applied law. Because Fla. Stat. § 448.01 is "so vague and indefinite as really to be no rule or standard at all," the Court cannot allow a jury to find Eckerd liable for allegedly violating its proscriptions (whatever they may be). Therefore, Counts IV, VII and X are dismissed.

### E.    Quantum Meruit Claims (Counts V and VIII)

Plaintiffs also claim that they are entitled to wages for the hours they worked at work parties based upon a theory of quantum meruit. The elements of a cause of action for quantum meruit (quasi contract) are that: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4)

the circumstances are such that it would be inequitable for the defendant to retain the benefit without

paying fair value for it. *Hull & Company, Inc. v. Thomas*, 834 So. 2d 904, 907 (Fla. 4th DCA 2003).

In *Thomas*, the court explained that a claim of quantum meruit is synonymous with a claim

for a contract *implied in law*, as opposed to a contract *implied in fact*.

> A contract implied in law, or quasi contract, is not based upon the finding, by a
> process of implication from the facts, of an agreement between the parties. A
> contract implied in law is a legal fiction, an obligation created by the law without
> regard to the parties' expression of assent by their words or conduct. The fiction was
> adopted to provide a remedy where one party was unjustly enriched, where that party
> received a benefit under circumstances that made it unjust to retain it without giving
> compensation.

*Id.* at 907-07 (quoting *Commerce Partnership 8098 Ltd. Partnership v. Equity Contracting Co.*, 695

So. 2d 383, 386 (Fla. 4th DCA 1997)). *Commerce Partnership* engaged in an extensive discussion

of the distinction between quantum meruit actions and actions based upon contracts implied in fact,

a distinction that has often been blurred by Florida courts. A quantum meruit action may lie "where

there is no enforceable express or implied in fact contract but where the defendant has received

something of value." *Commerce Partnership*, 695 So. 2d at 387. Conversely, a contract implied in

fact exists where, for example, "services were performed under circumstances in which the parties

understood and intended that compensation was to be paid." *Id.* (quoting *Tobin & Tobin Ins. Agency*

*v. Zeskind*, 315 So.2d 518, 520 (Fla. 3d DCA 1975)).

Here, the record indisputably shows that: (1) Plaintiffs were salaried employees who received

the same salary each week, regardless of the amount or type of work they performed in any given

week;[33] (2) Plaintiffs accepted the salaries throughout their employment; and (3) Plaintiffs were never

---

[33] When Plaintiffs were assistant managers, they were paid pursuant to a fluctuating workweek schedule.

promised that they would receive any additional compensation for their participation in work parties. Indeed, if Eckerd had failed to pay Plaintiffs their salaries, Plaintiffs would have been entitled to maintain a cause of action based upon an implied in fact contract. *See id.* ("a common form of contract implied in fact is where one party has performed services at the request of another without discussion of compensation"). By accepting their salaries without complaint, and receiving the same compensation regardless of whether they participated in a work party, Plaintiffs accepted the terms of the implied in fact contract. Years later, Plaintiffs may not, through litigation, unilaterally attempt to alter the terms of the implied in fact contract.

Plaintiffs' argument that there is an issue of fact as to whether they received fair compensation for their services is misplaced. "Quantum meruit damages cannot be awarded upon the singular determination that the requesting party is deserving." *May v. Sessums & Mason, P.A.*, 700 So. 2d 22, 28 (Fla. 2d DCA 1997). Plaintiffs essentially ask the Court to alter the terms of the arrangement between the parties based upon their contention that they were not adequately compensated for the services they provided to Eckerd. Plaintiffs, however, identify no basis in fact or law in support of their argument.

Therefore, Plaintiffs' quantum meruit claims are denied.

## F.    Eckerd's Alleged Discovery Violations Do Not Require Denial of Summary Judgment.

Plaintiffs argue that Eckerd deliberately concealed and/or destroyed evidence pertaining to work parties. Even accepting Plaintiffs' characterization of Eckerd's discovery tactics, Eckerd's alleged malfeasance would not support the relief requested by Plaintiffs.

Plaintiffs extensively rely upon *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y.

CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

Plaintiffs extensively rely upon *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y.

2004), to support their position. Relying upon Second Circuit precedent, the *Zubulake* court held

that

> A party seeking an adverse inference instruction (or other sanctions) based on the
> spoliation of evidence must establish the following three elements: (1) that the party
> having control over the evidence had an obligation to preserve it at the time it was
> destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3)
> that the destroyed evidence was "relevant" to the party's claim or defense such that
> a reasonable trier of fact could find that it would support that claim or defense.

*Id.* at 430. While Plaintiffs' argument addresses the first two factors, it ignores the third factor.

Here, regardless of whether Eckerd destroyed or concealed work party evidence, the fact remains that

requiring managers to participate in one work party per month is not legally significant to the FLSA

exemption analysis or to Plaintiffs' other causes of action (as discussed in great detail above). Thus,

the relief sought by Plaintiffs is inappropriate under the circumstances,[34] although it is certainly

relevant to a consideration of any request for costs incurred by Defendant.

### III. CONCLUSION

For the reasons stated above, it is

**ORDERED AND ADJUDGED** that Eckerd's Renewed Motion for Final Summary

Judgment **[D.E. 294]** is **GRANTED**. The Clerk of the Court is instructed to **CLOSE** the case and

all pending motions are **DENIED AS MOOT**.

---

[34] A different question would be presented if there was a meaningful dispute over the frequency with which
Plaintiffs attended work parties and Eckerd argued that it was entitled to summary judgment based upon Plaintiffs'
inability to produce evidence to support the number of parties they attended. Here, Plaintiffs claim that they attended
an average of twelve work parties per year. While some of Eckerd's witnesses testified that the number of annual work
parties attended by managers was less than twelve, this Order adopts Plaintiffs' characterization of the facts. To the
extent that Plaintiffs argue that they have no ability to even estimate the approximate number of work parties they
attended without access to the destroyed evidence, the argument does not persuade.

CASE NO. 02-23623-CIV-ALTONAGA/Turnoff

**DONE AND ORDERED** in Chambers at Miami, Miami-Dade County, Florida this 16 day

of May, 2006.

CECILIA M. ALTONAGA
UNITED STATES DISTRICT JUDGE

cc:     Magistrate Judge William C. Turnoff
        counsel of record